Please call the next case. 312-995 Richard Borenscheurer v. Henry Senachwine School  We present a very simple issue for you today. Mr. Borenscheurer was awarded a scheduled award of 50% loss of use of the person as a whole under 8D2. We are asking that you revisit that and award a wage differential under 8D1. As we all know, the Supreme Court has a lot of earnings capacity. And in this case, our client meets both prongs of the wage differential test. First prong being loss of earnings. The second prong being a loss, a partial incapacity of his usual and customary line of employment. The third issue, which is stated in 8D2, is that the petitioner cannot waive his right to a wage differential. So in this case, essentially, the facts at this level are largely undisputed. And I dare argue this ---- Did you say petitioner cannot waive? No. He can under 8D2. He did not. Excuse me. He did not, yes. At this level, the facts are largely undisputed. So we know his earnings were 485.25 before the accident. After the accident, if you put him in, which we originally objected to at trial, but we concede that now and assume that he was able to earn $300. Well, there's your loss of earning right there. That's, what, 185.25 difference. And then incapacitated from pursuing his usual and customary line of employment. This was quite clear. The commission focused on this at the arbitration level and then again at the commission, making several statements throughout the decision, he can no longer work as a janitor. So that was quite clear. So he's met those two prongs. And then the third issue is, well, did he waive his right to a wage differential? No. And the arbitration decision simply states, well, he didn't make a request, okay, but we were asking for a total and permanent disability award. We were asking for the very highest. Why would we essentially argue against ourselves and say, well, if you're not going to give us the highest, then give us that one rung below. So in that sense. And also, during a colloquy or objection during trial, the school stated that it was not conceding that this was a wage differential case, right? Correct, yes. Indicated the matter was at issue and nobody, the claimant's side didn't indicate that it was an opposite issue, right? That's absolutely correct. Because they even discussed how they were paying him at the time of trial wage differential benefits in the amount that would be calculated based on the wages that I just gave you. So basically the elements were met. Everything. This case is very close to Gallianetti, which I rely very heavily on, which this Court decided. And basically the commission is without discretion. The word shall is in the statute and makes it quite clear. So based on that and based on the purpose of a wage differential in the Workers Compensation Act, according to the Supreme Court, as being the compensation of reduced earnings or lost earning capacity, we believe that our client is entitled to a wage differential award. Thank you. Okay. Thank you, counsel. Counsel, you may respond. May it please the Court. Counsel, my name is Matt Brewer. I'm here today on behalf of the respondent, the Henry Sinatchewan Grade School. The first thing I want to start off is contained in the Gallianetti case is actually a reference to a case, which is Butler Manufacturing Company versus the Industrial Commission. And I was rereading everything last night, kind of going over, and I think that actually the excerpt from that case that's contained in Gallianetti I think is very important. I want to make sure I get this right. It says, this Court has held, and they're referencing obviously the appellate court, that the Illinois Workers' Compensation Commission decision will be affirmed if any legal basis to sustain that decision, regardless of whether the reasonings or findings within that decision are correct and sound. And basically how I interpret that is if there are facts, as we know this, in our opinion, this is a manifest weight standard here today, if there are facts to support a denial of the wage differential contained in the record, which I feel that there is ample evidence to show that, then whether the reasonings contained in the commission's decision, which was essentially, was kind of a rubber stamp above Arbitrator Mathis' decision, if there are facts to support that decision, it should be affirmed. I think we discussed and counsel discussed as far as the election, almost kind of an election issue as far as how they proceeded. If you take a look at the stiff sheet at the time of trial, on the back of the stiff sheet, obviously that's where we mark off our issues, et cetera, it states in there directly that they are pursuing an odd-lot perm total. Now, I would anticipate a question would be, do you have to specifically ask or say something on the record, we're going for a wage differential. I don't think you do. But I think it would be safe, it might behoove you to put something in there, we are pursuing an odd-lot perm total, but in the alternative, we will attempt to prove a wage differential, assuming this Court does not find this particular individual to be a perm total or an odd-lot perm total. Kennedy Are you saying they are barred from asking for a wage differential at this level? I think it's inappropriate to attempt to piecemeal something that wasn't presented thoroughly at trial. Whether that's inappropriate, is there a legal bar that you're calling our attention to? I don't believe that there's a legal bar, Your Honor. I think, you know, if given the facts are there. But I think that leads me to my next series of points, is that if you assume that there's not a waiver or if you assume that the election kind of issue that I discussed is not valid, I don't think that a wage differential was properly as far as, I guess, proven up, if you will. The elements. Tell us why the elements were not proven. She outlined why she said it was. There was a finding of perm total there. There's evidence testified by Dr. Ehlers, Dr. Fletcher. Right. So tell us why the evidence is not there for a wage differential. I would say several things as far as the partial incapacity is concerned. The Dr. Sampali's restrictions are pretty severe. Dr. Sampali's restrictions are in 2006. I believe it was in June. Subsequent to that, there's two different FCEs. Both of them are showing severe symptom magnification. He has a base of pain behavior. He's showing exaggeration. The physical therapists have noted that. You take that into account. I know I pointed out in my brief the surveillance, which was done after that, after Dr.  He's walking a dog. He's doing all these things where when he's discussing why he can't do the expediter position or other positions that they were trying to during the course of vocational rehabilitation as far as elevating his leg, the actual things that are shown in the surveillance in some of the FCEs don't correlate with the ability to meet those types of severe restrictions. I think that in itself puts in question Dr. Sampali's restrictions. I think it makes them premature. And I think if you look at the surveillance, they become inaccurate. Having said that, Dr. Fletcher does subsequently see the petitioner after Dr. Sampali administers these restrictions. And he says, look, I'm looking at my exam. I'm looking at the FCE that was performed at his facility. I'm looking at the surveillance video. These restrictions are not valid. He can go back to work doing the janitorial position that he was doing for the grade school. I think that throws in a huge wrinkle as far as them being able to prove that there was a partial incapacity. Despite what the language or the reasoning that the commission's decision states, I think that the actual evidence itself shows that there was not a partial incapacity, and that he could return to this type of work. Now, I think if you take that, and also you look at Dr. Eilers now, as far as maybe this guy's current functional status, he doesn't need any more surgery. There's no more physical therapy. There's no brace that's even needed. You know, this isn't some massive knee injury. He even says that long term he needs, you know, This is Eilers you're talking about, right? Yes, Your Honor. Did he also say that he could work at a sedentary job at the hospital? He did. Okay. Well, doesn't that bear on the wage differential? But is there not evidence countering that within the record that would support that it would not be a wage differential as part of the statute? Well, certainly there is, but then who makes the decision? The commission does, Your Honor. And they did. Excuse me? And they did. Yes. And they chose to not award the wage differential. They chose to issue an award under 8D2 versus 8D1. It's not the question of the award they issued, but the condition of the claimant. Exactly. And what was, what did they find the condition of the claimant to be? They said that he could not return to the, there was two sentences in there where the decision itself from the arbitrator states that he could not return to that. But they adopted it. Correct. Once they say the claimant cannot return to his usual occupation, and there is evidence in the record of his inability to earn at the same level he was earning, they have to award a wage differential. They don't have any choice. They can't award permanent partial disability under the circumstances. Maybe they didn't realize it, but the law mandates it. Maybe the decision wasn't very well written. Well, that could be, too, but that won't go into it. But I think, you know, not only that, I think, and that brings me to my last point, he has to prove that the impairment earnings, or the earnings of the, excuse me, the impairment of the earnings. I frankly think that's very speculative. Just because there's no specific reference, I know that the actual decision itself states that we're not awarding a wage differential because it was not asked. That doesn't mean that this thing was not necessarily analyzed. Now, the only reference to where there would actually be any type of solid figure for a wage differential is Commissioner Dauphine's dissent. But she's making an assumption based upon what he would have started out making with Expediter, which I believe was minimum wage of $7.50 an hour. Well, he works that job for four hours and quits. And if you take a look at Jim Bragan's deposition, the deposition of the owner of Expediter, that's just the base. That's the start. He could easily move up. He could move up into other positions. There may not even be a differential whatsoever come trial time, and we can't actually find out that because he quits so soon. So I think any allegation that there is an impairment of earnings is speculative at best, because we don't have a job for him to earn, which in my opinion brings into their strategic decision at the time of trial to go for the odd lot, because there was, in my opinion, nothing really to base a wage differential on because he was not working. And I think at least as far as the impairment, the earnings do work. Do you have to be working to be entitled to a wage differential, or is it what you're capable of earning? It's what you're capable of earning, but I don't think that they established what he was capable of earning. There's a speculative starting point with the Expediter position. The testimony is also clear, and there's evidence in the record that you easily move up and, you know, find different positions. That's a starting point. And the last thing I want to touch on, I think overall, and I know that the wording in the decision is somewhat confusing based upon, you know, some of the other medical evidence that I've presented, the earnings. I think it's well within reason based upon some of the stuff that I touched as far as the FCE, some of his interactions with the Expediter individuals, the surveillance that was conducted. Couldn't it just be that the arbitrator and subsequently the commission didn't find him credible, and they actually, you know, they believed that this guy could do more than he could? I wish that the commission would have maybe have written more and been a little bit more descriptive as far as taking care of some of the inconsistencies between the wording in the decision versus, you know, what actually is the denial of the wage differential. Because I understand your end counsel's argument. It states in there that he can't return to work. If you were really, really stretched, I guess you could understand where Commissioner Dauphine was coming in, and there could be established. I think it's speculative, and I don't think the evidence actually correlates or lends itself to establishing both prongs. And I think a lot of it becomes something that's speculative, and I think the award actually in itself is appropriate. Short of any questions, I will stand on that. Thank you. Thank you, counsel. Counsel, you may reply. I would like to address opposing counsel's earnings capacity argument. It was actually their expert who testified that it was a 40-hour-per-week job earning $7.50 per hour. That is where we had the basis for our wage differential, the 300. And at the trial level, we were arguing vehemently against the expediter job, even being a real job. But at this level, we are conceding that fact, and we are accepting that, okay, fine. If you see this as a real job, they have shown that he would be capable of earning $300 per week, and that is the basis for our earnings and capacity. To my earlier point, I would dare say that this could also be looked at under a different standard of review. Given the fact that if you take all the facts as you see them, all the findings of the commission, the findings of what the wages were, the findings of the inability to pursue his usual and customary line of employment, and the finding that the commission does not state that he waived his right to a wage differential, taking all of that true, then arguably the commission made an error in the law, because they are without discretion to award a wage differential in those circumstances. I'm sorry. They are without discretion to not award a wage differential in those circumstances. Pardon. And, yeah, that's all I have to say. Okay. Very well. Thank you, Counsel Bullock, for your arguments in this matter this morning. It will be taken under advisement and a written disposition of knowledge.